# Wytheville.

## A. WRIGHT, JR., ET ALS., EXECUTORS, ETC. v. CHARLES HALL DAVIS, TRUSTEE, ET ALS.

### June 17, 1926.

1. PAROL EVIDENCE—*Varying Written Instruments—Case at Bar.*—Where two deeds, an agreement and a lease determined the legal and equitable rights of the parties, and there was no obscurity in either of the deeds or lease, they are conclusive, and the recollections of the parties after a long lapse of time are not admissible.

2. TRUSTS—*Resulting Trusts—Purchase Money Furnished by Another than Grantee.*—Where the consideration is all furnished by another, there is a resulting trust in favor of the one who supplies the consideration.

3. TRUSTS—*Resulting Trusts—Purchase Money Furnished by Another than Grantee—Case at Bar.*—The rule that a resulting trust arises in favor of one who supplies the consideration for a purchase could not be applied in the instant case, because the evidence was clear that all of the parties interested unequivocally agreed that the legal and beneficial interest in a water power severed from other property should be vested in complainant and his associates, and this agreement was recognized in a lease by complainant and his associates, signed by all the parties interested. In the face of this carefully drawn lease signed by every party in interest, showing precisely the beneficiaries in the trust, doubts sought to be raised by appellants based on their faulty recollections, one of whom said that he had forgotten that he had ever signed the lease, cannot be considered.

4. MORTGAGES AND DEEDS OF TRUST—*Trustees's Sale—What Trustee May Sell—Case at Bar.*—In the instant case, the trustee in a deed of trust given by a corporation, on the company becoming insolvent, sold its property at public auction and undertook to sell "whatever rights" the corporation had in a certain water power by virtue of a certain agreement between the corporation and complainants and others. It appeared from the agreement referred to that the corporation was primarily a lessee of the water power.

   *Held:* That as the trustee could not sell more than the corporation owned, and it was shown that the corporation was a mere lessee of the water power, the water power did not pass to the purchasers at the trustee's sale.

5. QUIETING TITLE—*Lease of a Water Power—Lease Cancelled as a Cloud on Title after Twenty Years—Case at Bar.*—A milling company leased a water power from a trustee and the beneficial owners. Neither the milling company nor its successors ever asserted or claimed any of their peculiar rights under the lease, which also imposed burdens, or discharged any of its obligations thereunder. There had been a failure of consideration to the lessors.

*Held:* That on complaint of the trustee and others, beneficiaries, the trial court did not err in cancelling the lease as a cloud upon the title of the trustee.

Appeal from a decree of the Circuit Court of the city of Petersburg. Decree for complainant. Defendant appeals.

*Affirmed.*

The opinion states the case.

*Plummer & Bohannan*, for the appellants.

*R. T. Wilson, Charles T. Lassiter*, and *R. B. Willcox*, and *Mann & Tyler*, for the appellees.

PRENTIS, P., delivered the opinion of the court.

This record and the briefs present a congeries of original, amended and supplemental bills, answers and demurrers, arguments and contentions, based upon parol evidence consisting of the recollections and the forgettings of the parties interested, testifying as to occurrences of twenty-four years ago, introduced to vary and contradict cotemporaneous documentary evidence.

We shall not attempt to recite these confusing details. We are relieved of that necessity because, as one result of their various concerted plans to buy, sell and combine several cotton mills and also to develop and utilize the water power of the Appomattox river at Petersburg, they acquired the Pocahontas Mills prop-

erty, separated it from its water power, and thereafter executed a certain declaration of trust agreement and lease of such water power. The construction of this agreement is the fundamental question which is involved in this suit.

Charles Hall Davis obtained an option upon the Pocahontas Mills property, apparently acting for himself and his five associates. Exercising this option he, with their knowledge, took a deed from that company to himself, dated May 26, 1903, to "all the right, title and interest it now owns or possesses in the water of the Appomattox river, whether as owner of land abutting upon said river, or in any other manner, including all riparian rights, water rights, privileges, powers, or easements in water, of any and all kinds which now belong to the said party of the first part as appurtenant to its land, or in any other manner whatsoever." This deed then recites the chain of title, and contains this further description: "And the land hereby conveyed and granted is about ten (10) acres. And the water power hereby conveyed is all of the water power of the Appomattox river at this point, and at the dam of said company." It also conveys "so much of its real estate, if any, as is, or may be, necessary legally to support the conveyance of the water rights, privileges, powers and easements hereby intended to be conveyed and make the said conveyance valid and sufficient to carry the fee simple title to said rights, privileges, powers and easements."

By another deed dated the next day, May 27, 1903, the Pocahontas Mills conveyed its mills and the residue of its property (which the appellants now own), excepting the land and water power rights which had theretofore been conveyed to Charles Hall Davis. Then, on October 1, 1903, an agreement and lease was

entered into between Charles Hall Davis and his five associates, George E. Fisher, E. A. Hartley, Augustus Wright, Richard B. Davis and Philip Rogers, as owners of the water power, of the one part, as grantors or lessors, and the Virginia Consolidated Milling Company, as grantees or lessees. It is over this agreement that this controversy chiefly arises. It is copied in the margin.* It was admitted to record October 20, 1903. There was no concealment, chicanery or fraud and all of the parties had actual notice of and participated in these transactions.

The decree from which this appeal is taken by the executors of Augustus Wright and E. A. Hartley, cancels this lease as a cloud upon the title of Davis and his said associates, who claim the Pocahontas water power under the conveyance to Davis of May 26, 1903, and decides that the property and water rights thereby conveyed now belong to Davis and his five

---

*"Whereas, by deed dated May 26, 1903, recorded in the clerk's office of the hustings court, Petersburg, Virginia, volume 66, page 471, and in Dinwiddie county clerk's office, volume 25, page 413, the Pocahontas Mills, a corporation duly established under the laws of the State of Virginia, conveyed to Charles Hall Davis, of Petersburg, Virginia, certain riparian rights, water rights and easements, together with so much land as was necessary to support said conveyance; and

"Whereas, the said Charles Hall Davis, as the grantee in said conveyance, was acting not only for himself but also for the benefit of George E. Fisher, of New York, E. A. Hartley, Augustus Wright and Richard B. Davis, all of Petersburg, Virginia, and Philip Rogers of Westhope, Virginia, and

"Whereas, the Virginia Consolidated Milling Company is now the owner of the Pocahontas Mills, the Ettrick Mills and the Matoaca Mills, so called; and

"Whereas, in the event of the inability of the Virginia Consolidated Milling Company to continue to use the water powers above described, it will be necessary for said Company to secure electric or other power for transmission to its said mills; and

"Whereas, it is desired by these presents to secure to said Milling Company sufficient power for its said mills whenever the said water powers shall cease to be available by reason of such diversion of the water or the development of the Pocahontas water power as hereinafter stated.

"Now, therefore, this agreement, made this first day of October, 1903, between Charles Hall Davis, George E. Fisher, Richard B. Davis, Augustus Wright, E. A. Hartley and Philip Rogers, parties of the first part, Sallie Bernard Davis, wife of said Charles Hall Davis, who joins herein solely for the purpose of releasing, so far as this agreement is concerned, any

associates who are named in the lease and agreement of October 1, 1903.

In the consideration of the legal questions raised, it should be borne in mind that this agreement and lease was signed by all of the parties interested, or by those under whom they claim, including Wright and Hartley. The controversy in its final form is as to whether the executors of Augustus Wright and E. A. Hartley, the appellants here, have since acquired this water power property so conveyed to Davis, or whether it still belongs to Charles Hall Davis as trustee holding the legal title for the benefit of himself, George E. Fisher, E. A. Hartley (appellant), Augustus Wright, (whose executors appeal), the successors of Richard B. Davis, deceased, and of Philip Rogers, deceased.

[1] The claim of appellants seems to be largely based upon general considerations as to various antecedents cotemporaneous and subsequent transactions between

dower interest, or other interest, she may have in the estate conveyed to Charles Hall Davis as aforesaid and for no other purpose, party of the second part, and the Virginia Consolidated Milling Company, a corporation, as aforesaid, party of the third part,

"Witnesseth, That the said parties of the first part, in consideration of the premises and of one dollar to them cash in hand paid by the party of the third part, the receipt of which is hereby acknowledged, and in further consideration of the sums to be paid to them, their successors or assigns, by the party of the third part, as hereinafter provided, do hereby lease to said party of the third part the Pocahontas water power, so called, and all the estate, rights and other property, real or personal, or of any nature whatsoever, conveyed to said Charles Hall Davis by said deed of Pocahontas Mills hereinbefore referred to, for the operation of the Pocahontas Mills as they now exist, or as they hereafter may be enlarged, and for the other intents and purposes hereinafter provided, to have and to hold to the said Virginia Consolidated Milling Company, its successors and assigns, for the term of fifty (50) years from the first day of October, 1903, or until the prior expiration or termination of this agreement as hereinafter provided, at an annual rental of five dollars ($5) per horse-power for the power developed on the water wheels of the said Pocahontas Mills, such rental to be paid monthly on or before the tenth day of each month for the preceding month's rent. The amount of power so developed shall be ascertained by a representative from the parties of the first part and a representative from the party of the third part, and these two, in case of disagreement, shall select a third, whose decision shall be final and binding on all parties.

the parties. As we have indicated, however, we are of opinion that the two deeds and the agreement and lease referred to determine the legal and equitable rights of the parties as of their respective dates, and are conclusive. There is no obscurity in either of the deeds or the lease. The provisions of the lease may be thus fairly summarized:

It first makes clear by a specific declaration that Charles Hall Davis holds the legal title to the water power for the benefit of himself and his five associates who are named, each of whom signed and acknowledged it for record; and it was recorded October 20, 1903. It recites that the Pocahontas Mills, then owned by the other party to the agreement, Virginia Consolidated Milling Company, are now being operated directly by the water power which is owned by Davis, as aforesaid, and that it is desired to secure to that company sufficient power for its mills whenever the said water

"The parties of the first part hereby convenant, agree and bind themselves, their heirs, representatives and assigns, whenever the water power now utilized by said mills become unavailable by reason of the diversion of the water of the river by the Virginia Passenger and Power Company, or by the development of the Pocahontas water power, so called, as hereinafter provided, to secure for the party of the third part a contract with some suitable power company, by which said power company shall contract to sell and deliver to said party of the third part, for a term expiring not before October 1, 1953, electric power delivered on the switchboards at the mills of the party of the third part, sufficient to operate said mills, but not exceeding fifteen hundred (1,500) electric horse-power in the aggregate, at a cost not exceeding seven (7) mills per K. W. hour, upon the delivery of which contract, properly executed, the parties of the first part shall be hereby released from all further obligation under this agreement, and the party of the third part will thereupon release all its claim to the use of the Pocahontas water power at the Pocahontas Mills at five dollars ($5) per horse-power per annum, as above provided, and all its rights, of every kind and description, under this agreement, and covenants to execute and deliver to the parties of the first part such releases, deeds or other instruments, as may be necessary or advisable to carry this agreement into effect; and upon delivery of such contract the party of the third part covenants and agrees such agreement for the purchase of electric horse power at a price not exceeding seven (7) mills per K. W. hour, for a term ending not before October 1, 1953, unless in the meantime some contract for power at a lower price for the same term has been made by said party of the third part, in either of which cases all rights of said party of the third part under this agreement shall thereupon cease and determine

power shall cease to be available by reason of the diversion of water or the development of the Pocahontas water power, as hereinafter stated. By way of parenthesis, it may be said that at that time the owners of this Pocahontas water power, Davis and his associates, all of whom were also interested in the lessee company, had plans for the development of the Pocahontas water power and the production of electric power for distribution. The lease then provides that Davis and associates, including Hartley and Wright, do lease the water power to the consolidated company for fifty years (being the period for which the consolidated company's bonds had been issued some two months before) at an annual rental of $5.00 per horse power, payable monthly; that the amount of horse power shall be determined by arbitration; that the lessors agree that whenever the water power used by the mills shall become unavailable "by reason of the

and the party of the third part will thereupon execute and deliver such releases, deeds, or other instruments as may be necessary or advisable to relieve the parties of the first part from the provisions of this instrument and to remove any cloud occasioned thereby upon the title to said Pocahontas water power property.

"Subject to the provisions of this agreement, the said parties of the first part shall have the right, at any time during the continuance of this agreement, to proceed to develop and enlarge the Pocahontas water-power and to convert the same into electric power and for such purpose to convey the said property to a joint stock company, and to execute a mortgage upon it for the purpose of providing funds for its developments.

"Should the parties of the first part fail to perform any of the agreements or stipulations herein contained on or before the time when the water power now used by the Ettrick Mills and the Matoaca Mills shall become unavailable by reason of the diversion of the water of the river from Matoaca and Ettrick by the Virginia Passenger and Power Company, or by reason of the development of the Pocahontas water power, as above set forth, then the parties of the first part hereby covenant and agree to convey to the party of the third part, upon its written demand, a title in fee simple to the Pocahontas water rights property above described as conveyed to said Charles Hall Davis and such conveyance shall be taken and considered as liquidated damages in full of all claims against the parties of the first part for failure to carry out this agreement.

"This agreement may be hereafter changed or modified by consent of the parties of the first and third parts, on condition that such change is assented to in writing by the International Trust Company, the trustee under a mortgage or deed of trust from the Virginia Consolidated Milling

diversion of the water of the river by the Virginia Passenger and Power Company, or by the development of the Pocahontas water power," to procure a contract for electric current during the period of the lease for not exceeding 1,500 horse-power at a cost not exceeding seven mills per kilowatt hour; that upon procuring such contract the lessors would be relieved from all further obligation under the agreement, and lessee would execute such release or other instrument as might be necessary to that end.    The lessee only agreed, however, to execute such a contract when presented unless it in the meantime had secured a contract for current at a lower rate.    The lessors, subject to the obligations of the agreement, reserved the right to develop and enlarge the water power and convert it into electric power, and the right to convey the water power to a corporation and to execute a mortgage in order to raise funds for its development. Then follows the provision that if the lessors failed to

Company, dated August 7, 1903, and no such change or modification shall be made without the written consent of said International Trust Company.

"The parties of the first part agree to execute and deliver to the party of the third part any other or further deeds, agreements or instruments in addition to these presents or in substitution therefor, as may hereafter be necessary to carry out the purpose and intent hereof.

"In testimony whereof, the Virginia Consolidated Milling Company has caused these presents to be signed by its president and its corporate seal to be hereto affixed, attested by its secretary, and the parties of the first and second parts have hereto affixed their hands and seals, this first day of October, 1903.

"VIRGINIA CONSOLIDATED MILLING CO.

(Company's seal)                    "By AUG. WRIGHT, President.
   "Attest:
      "Charles Hall Davis,
         "Secretary.

| | |
|---|---|
| "E. A. HARTLEY, | (Seal) |
| "CHARLES HALL DAVIS, | (Seal) |
| "PHILIP ROGERS, | (Seal) |
| "AUG. WRIGHT, | (Seal) |
| "G. E. FISHER, | (Seal) |
| "RICHARD B. DAVIS, | (Seal) |
| "SALLIE BERNARD DAVIS, | (Seal) " |

perform their agreement on or before the time when the water power then being used should become unavailable, the lessors agreed to convey to the consolidated company "upon its written demand a title in fee simple to the Pocahontas water rights property above described as conveyed to said Charles Hall Davis." Then it was provided that the agreement could not be changed or modified without the consent of the International Trust Company, the trustee in a deed of trust from the consolidated company securing its large issue of bonds, dated August 7; 1903.

Some of these provisions may be obscure and are certainly unusual, but these propositions are clear, namely, that Charles Hall Davis held the property as trustee for himself and his five associates, who are named; that he and his associates, as the owners of the property, were the lessors; and that the consolidated company was the lessee.

[2, 3] It is fair to state that the chief claim of the appellants, Wright's executors and Hartley, is that Davis, in acquiring the power, acquired it for the Virginia Consolidated Milling Company (whose title they have since acquired), and that he held it as trustee for that company, either upon a resulting constructive or express trust. The basis for the claim that it was a resulting trust is that the only consideration received by the Pocahontas Mills, original grantor in the two deeds of August 26 (to Davis) and August 27 (to the corporation), hereinbefore referred to, was $130,000 in bonds of the then recently organized Virginia Consolidated Milling Company, the successor of the grantee in one of these deeds. Of course, the equitable principle upon which this claim is founded must be conceded, the general rule being that when one takes a conveyance in his own name, where the

consideration is all furnished by another, there is a resulting trust in favor of one who supplies the consideration. This rule cannot be applied here because the evidence is clear that all of the parties interested unequivocally agreed that the legal and beneficial interest in the water power severed from the other property should be vested in Davis and his associates, and this agreement is recognized in the lease. They were all interested both in the milling company, which acquired part of the property, as well as in the trust under which Charles Hall Davis is shown to have acquired the water power rights, and all agreed specifically to the severance of the title. This is manifest from the separate conveyances as well as by the express declarations of trust contained in the agreement and lease of October 1, 1903. Confronted with this carefully drawn paper signed by every party in interest, showing precisely the beneficiaries of the trust, we decline to consider the doubts sought to be raised by the appellants which are based on their faulty recollections, one of whom said he had forgotten that he had ever signed the lease agreement. These documents are conclusive of this decisive point.

Charles Hall Davis and Richard B. Davis sold their bonds and stock in the Virginia Consolidated Milling Company to Hartley and Wright in November, 1909, and it is claimed that this carried their interest in the Pocahontas water power. It is only necessary to say as to this that the written evidence of that transaction conclusively negatives this contention by omiting any allusion thereto.

[4] When the Virginia Consolidated Milling Company became insolvent and its property was sold at public auction, Hartley and Wright acquired it, and the substituted trustee at this foreclosure sale under-

took also to sell "whatever rights" that corporation had in the Pocahontas water power, "by virtue of a certain agreement between Charles Hall Davis and others with the Virginia Consolidated Milling Company," referring to the lease agreement. Of course the trustee could not sell more than the milling company owned. As we have seen, it is not shown that the milling company ever had any interest in this water power, except that which it acquired under the lease agreement. As we have already undertaken to show, that paper shows that the milling company was primarily a lessee, and so this purchase is clearly insufficient to support that contention.

There are some strange things in the case. It is strange that Charles Hall Davis, trustee for his associates, the beneficial owners of this water power, never collected any rent from their lessee. At the final hearing they waived their claims for rent. It is strange that the lessee never offered, apparently, to pay any rent whatever until after this litigation had commenced in 1915. In this court there is an offer to pay rent for one year. The only explanation which is made by counsel for Mr. Davis is that he was in difficulties for several years which demanded all of his thought and time, and it was not until 1913 that he came upon this lease in going over his papers, and that he then at once took the matter up, and this suit was the result. Perhaps it was also because all of the parties were then interested in both properties, and the payment of rent would have been taking from one pocket to put in another. It is strange that Hartley and Wright, notwithstanding this lease agreement which they both signed, should ever have thought that merely by acquiring the stock and bonds and eventually the assets of the Virginia Consolidated Milling Company,

lessee, they thereby acquired their lessors' property, this Pocahontas water power. There is nothing in the record save the fact that the parties were engaged in a joint adventure, which has failed, upon which to base the contention that they have in some way acquired the ownership of this real estate, which certainly cannot be so informally transferred to them. The appellants have failed to show any sufficient reason for excluding their associates from the beneficial joint ownership of this water power property.

[5] A generation has passed, several of the original parties are dead and their plans for developing and utilizing the water power have all failed. Neither the lessee milling company nor its successors, the appellants, ever either asserted or claimed any of their peculiar rights under the lease (which also imposed burdens) or discharged any of its obligations thereunder. There has been a failure of consideration to the lessors. What then should a court do? We confess that we know of nothing better to be done than that which the trial court concluded to do, and that is to put the parties in the same position which they occupied at the time they made and expressed their agreement in writing. To pursue any other course would be to decide the case upon the uncertain recollections of those whose memories cannot be relied on, and who contradict each other, rather than to rest it upon their carefully considered written agreements.

*Affirmed.*